**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **ADVANCED MEDICAL DESIGNS, INC.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No.: 22-cv-00789-SAG** |
| | * | |
| **CORBIN CLINICAL RESOURCES, LLC,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

The parties to this patent litigation are Plaintiff Advance Medical Designs, Inc. ("AMD") and Defendant Corbin Clinical Resources, LLC ("Corbin"). Before this Court is claim construction for the disputed terms of U.S. Patent Nos. 10,064,681 ("the '681 Patent"); 11,096,762 ("the '762 Patent"); 11,246,677 ("the '677 Patent"); 11,446,056 ("the '056 Patent"); and 11,547,436 ("the '436 Patent) (together, the "Asserted Patents").

The issues have been fully briefed, and the Court held a claim construction hearing on April 21, 2025. For the following reasons, the claim constructions adopted by the Court will govern this litigation.

## I.    BACKGROUND

Corbin is the assignee of five Asserted Patents at issue in this case. All five Asserted Patents generally describe the same invention: "methods, systems, and apparatus useful for planning and performing guided and free handed transperineal ultrasound-guided prostate biopsies." ECF 75-1 at col. 1:20-22. Such biopsies help to accurately diagnose prostate cancer and other diseases by inserting a needle through the perineum, an area of skin between the base of the scrotum and rectum, rather than through the rectum, which poses the risk of introducing bacteria into the

prostate. The apparatus disclosed by the Asserted Patents includes a transrectal ultrasound probe, an access needle configured to perforate a perineal access site of a patient, a biopsy gun, and a guide. *See id*. at 1 (Abstract).

In August and December 2020, Corbin sent demand letters to AMD asserting that AMD's SureFire device infringes on the '681 Patent and requesting that AMD cease and desist from making or selling the device. ECF 36-4, 36-6. In response, on October 22, 2021, AMD initiated this lawsuit seeking declaratory judgment of non-infringement and invalidity of the '681 Patent. ECF 1. On April 18, 2022, Corbin brought counterclaims alleging infringement of the '681 Patent as well as the '762 Patent and '677 Patent. ECF 19. On June 21, 2022, AMD amended its complaint to add claims for declaratory judgment of non-infringement and invalidity of the '762 Patent and '677 Patent. ECF 36; *see also* ECF 46 (second amended complaint filed on July 20, 2022, withdrawing an unrelated state law claim).

**Claim Construction Briefing, Round 1:** The parties fully briefed their proposed claim constructions for the '681 Patent, '762 Patent, and '677 Patent from September 2022 to November 2022. *See* ECF 55 (joint statement), ECF 57-58 (opening briefs), ECF 60-61 (responsive briefs). A claim construction hearing was scheduled for December 12, 2022. However, on November 16, 2022, Corbin notified AMD of its intent to add two more patents, the '056 Patent and '436 Patent, to the case. ECF 110-7. The USPTO had granted the '056 Patent in September 2022, ECF 66-4, and was expected to grant the '436 Patent by the end of the year. *Id.* Considering this, the parties jointly asked to vacate the claim construction hearing, ECF 62, which this Court did, ECF 65. The USPTO granted the '436 Patent on January 13, 2023. ECF 66-5. Corbin then brought counterclaims for infringement of the two new patents (the '056 Patent and the '436 Patent) on

January 31, 2023. ECF 66. AMD filed an answer to those counterclaims in February 2023. ECF 71.

**Claim Construction Briefing, Round 2:** From July 2023 to September 2023, the parties completed a second round of claim construction briefing to account for disputed terms in the '056 Patent and the '436 Patent. *See* ECF 74 (joint statement), ECF 75–76 (opening briefs), ECF 83–84 (responsive briefs). The parties then participated in a settlement conference in October and November 2023, but that effort was unsuccessful. ECF 92, 94.

In December 2023, Corbin again asked this Court to schedule a claim construction hearing. ECF 99. This Court initially scheduled the hearing for April 2024. ECF 102, 104. In March 2024, AMD filed a motion to stay the entire case (including claim construction) pending USPTO proceedings. ECF 108. The Court rescheduled the claim construction hearing to July 17, 2024. ECF 112.

**Claim Construction Briefing, Round 3:** In May 2024, AMD filed a motion to amend its claim construction briefing. ECF 113. AMD sought to amend its proposed claim construction of three of the disputed claim terms, arguing that Corbin took a fundamentally different position with respect to those terms in the USPTO proceedings than it had taken in the second round of briefing. The Court converted the July 2024 claim construction hearing into a motions hearing on AMD's pending motion to stay, ECF 108, and motion to amend, ECF 113. ECF 118. At the July 2024 hearing, AMD and Corbin agreed that it would be useful to wait for the USPTO to make "First Office Actions" on the '681, '762, and '677 Patents and a "Second Office Action" on the '056 Patent. The Court denied the motion to stay, instructed the parties to provide updates on the USPTO proceedings, and granted AMD's motion to amend its claim construction briefing. ECF 120.

In October 2024, the Court issued an order setting a claim construction hearing for April 21, 2025 and directing the parties to continue providing updates regarding relevant USPTO proceedings. ECF 138.

## II.    LEGAL STANDARD

Claim construction is a question of law, to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). Specifically, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." Therefore, "district courts are not ... required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). For instance, terms that are "commonplace" or that "a juror can easily use [ ] in her infringement fact-finding without further direction from the court" need not be construed because they "are neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history."

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Thus, unsurprisingly, "the claim construction analysis must begin and remain centered on the claim language itself." *Id.* A court should give the term's words their "ordinary and customary meaning" as would be understood by "a person of

ordinary skill in the art in question at the time of the invention." *Id.* at 1313.[1] "A determination that a claim term . . . has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361.

In addition to the plain language of the claim itself, "the claim should be read within the context of the entire patent, including the specification." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., Inc.*, No. 07-01388, 2009 WL 6898404, at *1 (D. Md. Mar. 20, 2009). The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Yet, in other Federal Circuit decisions, the specification's use has been limited to circumstances in which either "a patentee sets out a definition and acts as his own lexicographer," or "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016). To this end, the Federal Circuit has "acknowledge[d] the difficulty in drawing the fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019). Through close review of the specification, "[m]uch of the time . . . it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the

---

[1] "A person of ordinary skill in the art" is often referred to as a POSITA. AMD contends that "[f]or the Asserted Patents, a POSITA at the time would have had at least an advanced medical degree (e.g. a Doctor of Medicine or a Doctor of Osteopathic Medicine), at least two years of experience performing biopsy procedures, and some exposure to transperineal procedures and medical device design." ECF 122 at 12. Corbin does not disagree.

embodiments in the specification to be strictly coextensive." *Phillips*, 415 F.3d 1323. To that end, for the specification language to restrict the scope of claim term, it must "rise to the level of 'a clear and unmistakable disclaimer.'" *Cont'l Circuits*, 915 F.3d at 797 (quoting *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012)).

"In addition to consulting the specification ... a court should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Relatedly, "statements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer." *Asylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017). As with disclaimers in the specification, to disavow the claim's scope, the statement in the prosecution history must be clear and unambiguous. *See Cont'l Circuits*, 915 F.3d at 798.

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. Extrinsic evidence includes expert and inventor testimony, dictionaries, and learned treatises. It may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "Extrinsic evidence may demonstrate the state of the prior art at the time of the invention. It is useful to show

6

what was then old, to distinguish what was new, and to aid the court in the construction of the patent." *Id*. "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.

## III.  ANALYSIS OF THE DISPUTED TERMS

According to the Joint Claim Construction Statement the parties filed in July 2024, ECF 121, there were thirteen disputed claims spread across the five Asserted Patents. On March 21, 2025, the parties filed an Amended Supplemental Joint Claim Construction Statement listing just eleven disputed terms because they reached agreement on Term 1 ("pair of stabilization members") and Term 4 ("access needle").[2] ECF 152; *see Regents of the Univ. of Cal. v. Micro Therapeutics, Inc.*, 507 F. Supp. 2d 1074, 1080 (N.D. Cal. 2007) ("As a general matter, the Court accepts parties' stipulations to the definition of a [term or] phrase, unless it appears to be erroneous as a matter of law…It is in the interest of judicial economy to encourage parties to stipulate to a definition for purposes of advancing the case. "). The Court will defer construction of Term 9 ("lumen sized to receive a biopsy needle there through") and Term 10 ("distal point of the pair of stabilization members is offset from (a fastener of the base portion, the mount of the base)") until summary judgment because these terms involve indefiniteness arguments under 35 U.S.C. § 112(b). *See Gilead Scis., Inc. v. Mylan Inc.*, No. 1:14CV99, 2015 WL 1534067, at *2 (N.D. W.Va. Apr. 6, 2015) (discussing the principles weighing against ruling on indefiniteness at the claim construction

---

[2] For ease of reference, numbering of the terms in this opinion corresponds with the order that the terms are listed in the most recently filed Joint Claim Construction Statement, ECF 152.

stage). At the hearing, the parties also informed the Court that Term 3 ("biopsy needle") was no longer in dispute. The Court will therefore address the eight remaining disputed terms.

   a. **Term 2: "pair of stabilization bars"**

| Term 2 | Patent(s) & Claim(s) Involved | AMD's proposed construction | Corbin's proposed construction |
|---|---|---|---|
| "pair of stabilization bars" | '681 Patent (claims 1, 3, 8) | "pair of stabilization bars positioned on the upper mount, not integrally connected to the lower mount or the platform" | No construction necessary – plain and ordinary meaning |

In previous rounds of claim construction briefing in this case, AMD has asserted that Term 2 should be given its plain and ordinary meaning, ECF 122 at 13-14, ECF 121 at 5. However, AMD now proposes a new construction "to reflect Corbin's narrowed claim scope" in the '681 Patent reexamination proceedings. ECF 149 at 7.[3] Specifically, AMD advances a prosecution disclaimer argument, contending that construction of "stabilization bars" must be consistent with Corbin's assertions in the '681 Patent reexamination that "the stabilization bars must be part of the upper mount, distinguishable from the lower mount." ECF 149 at 10-13. AMD notes that the USPTO's most recent Office Action on the '681 Patent "agreed with Corbin's limitation of the 'stabilization bars' scope," and AMD's proposed construction takes this limitation into account. *Id*. at 10; *see also* ECF 149-2 at 24 ("it is noted that the 'stabilization bar' is the 'configuration to couple' the upper mount to the lower mount"). Therefore, AMD "proposes a construction stating that the stabilization bars are positioned on the upper mount separate from the lower mount." ECF 149 at 11.

---

[3] Unless otherwise noted, this Court uses the ECF page numbers in the header at the top of the page for pincites.

For its part, Corbin proposes that "pair of stabilization bars" be construed according to its plain and ordinary meaning, ECF 152 at 2, although it had proposed a different construction in prior briefing, *see* ECF 121 at 5, ECF 75 at 10-15. Corbin argues that AMD has not pointed to any "clear and unmistakable" statements made by Corbin in the '681 Patent reexamination that limit the meaning of "stabilization bars." ECF 153 at 7; *see 01 Communique Lab., Inc. v. LogMein, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) ("When the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit the relevant claim term to exclude the disclaimed matter." (citation omitted)). Rather, Corbin contends that it was responding to "what the Examiner identified as the 'pair of stabilization bars'" and "repeatedly and expressly stated that it did not agree with the Examiner's reading of '681 claim terms." ECF 153 at 7.

Here, the plain and ordinary meaning of "pair of stabilization bars" is consistent with intrinsic evidence. *See, e.g.*, ECF 75-1 ('681 Patent) at col. 4:32-35, 5:16-17, 5:40-41, 5:50-52. This is not an instance where the specification reveals a "special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," or an intentional disclaimer of the claim scope by the inventor. *See Phillips*, 415 F.3d 1316. The limitations imposed by AMD's construction are not needed to interpret what the patentee meant by Term 2. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988). Also, AMD's proposed construction for Term 2 is only with respect to the '681 Patent; for the '677 Patent and the '762 Patent, AMD maintains that "pair of stabilization bars" should be given its plain and ordinary meaning. ECF 149 at 7. However, the claim term should be interpreted consistently across all asserted patents in situations such as this, where multiple patents "derive from the same parent application and share many common terms." *See SightSound Techs., LLC v.*

*Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015); *see also Microsoft Corp. v. Multi–Tech Sys., Inc.,* 357 F.3d 1340, 1350 (Fed. Cir. 2004) (holding that statements made in prosecution of one patent are relevant to the scope of all sibling patents). AMD does not explain why the Court should deviate from this presumption here where the'681 Patent, the '677 Patent, and '762 Patent share terms and have similar, if not almost identical, specifications. *See* ECF 75-3 at col. 1:9-19. Finally, AMD has not shown "clear and unmistakable" statements by Corbin which narrow the term in the way AMD proposes. *See 01 Communique*, 687 F.3d 1292 at 1297 ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." (citation omitted)). Accordingly, the Court will adopt the plain and ordinary meaning for Term 2 ("pair of stabilization bars").

    **b.** **Term 5: "an upper mount and a lower mount configured to couple to each other, the lower mount configured to engage the transrectal probe"**

| Term 5 | Patent(s) & Claim(s) Involved | AMD's proposed construction | Corbin's proposed construction |
|---|---|---|---|
| "an upper mount and a lower mount configured to couple to each other, the lower mount configured to engage the transrectal probe" | '681 Patent (claim 1) | "an upper mount and a lower mount configured to: <br><br>independently engage a transrectal probe; and couple to an upper mount" | No construction necessary – plain and ordinary meaning |

    As with Term 2, AMD argues that its proposed construction for Term 5 encompasses arguments Corbin made during the prosecution history of the '681 Patent to allegedly limit the scope of the claim at issue. AMD contends that its proposed construction requires that the lower mount of the device "independently engage" the transrectal probe because Corbin's arguments during the prosecution of the '681 Patent only capture a device with a lower mount that

independently engages the probe, Corbin made these arguments to overcome prior art, and Corbin cannot "recaptur[e] through claim interpretation specific meanings disclaimed during prosecution." ECF 122 at 18 (citation omitted); *see also* ECF 149 at 14. AMD points out that the original version of the claim at issue was rejected and amended, after the patent examiner flagged the claim as potentially being anticipated by a patent issued for another device, Onik ("the Onik Patent"). ECF 122 at 20. The examiner "suggested amending claims to clarify the lower mount to overcome the [Onik] reference." *Id*.; ECF 58-6 at 2. Following an interview with the patent examiner, Corbin changed the claim language "to distinguish the upper mount and lower mount of Onik from the upper and lower mount claimed in the '681 Patent." ECF 122 at 20.[4] AMD adds that Corbin made similar arguments "limiting the scope of the 'upper mount' and 'lower' mount" to distinguish the '681 Patent from other prior art, BK Medical. ECF 149 at 15 (citing ECF 149-1 at 29-33). Therefore, AMD argues, "the '681 Patent claims cannot be construed to include…disavowed hinged clamps…like Onik and BK Medical, which do[] not couple to the upper mount independent of [their] coupling to the transrectal probe." *Id*.

In response, Corbin argues that any changes to the claim language were not required to differentiate its device from the Onik Patent, and therefore its amendment should not be read to limit the scope of the claim beyond that suggested by its plain language. ECF 132 at 15-16. Corbin also points out that, while the Onik Patent was originally considered potential prior art, that consideration was later disregarded because the Onik Patent refers to a different invention that is not used for transperineal biopsies (the Onik Patent is used in cryosurgery of the prostate). ECF

---

[4] The language Corbin added was "… and a lower mount configured to couple to each other, the lower mount configured to engage the transrectal probe and secure the upper mount relative to …" ECF 58-7 at 10.

132 at 17 (citing ECF 58-5, Onik Patent); *see also* ECF 58-7 at 15 (describing differences between the Onik Patent and the Corbin apparatus). Indeed, the patent examiner "stated he would remove the reference to Onik" based on Corbin's prior arguments that the Onik Patent was used for a different purpose and lacked various features (such as stabilization bars) that the Corbin product possesses. ECF 58-7 at 14; *see also* ECF 132 at 17-18; ECF 60-2 at 6-7; ECF 83-3 at 7-8. As a result, Corbin contends that any changes it made to the claim language, *see supra* n.4, during the prosecution were merely to add clarity and did not represent an express or implied "disavowal" regarding the scope of the claim. ECF 122 at 18-19 ("If anything, [the] language clarifies that the upper mount needs the lower mount in order to engage the transrectal probe.").

Corbin also states that it was responding to and disagreeing with, not affirming, the examiner's identification of an upper and lower mount in BK Medical. ECF 153 at 9 (citing ECF 149-1 at 31-32); *see also* ECF 149-1 at 6 n.1. Corbin argues that it "did not clearly and unmistakably disclaim BK Medical's structure as disclosing an upper and lower mount as AMD contends, but rather argued <u>how</u> the Examiner applied BK Medical did not render the '681 claims unpatentable." ECF 153 at 9 (emphasis in original).

The Court does not find that Corbin disavowed the scope of Term 5 during prosecution of the '681 Patent. Corbin's amendment to the claim language does not appear necessary to avoid potential prior art. *See* ECF 83-3 (July 24, 2018 Notice of Allowance) at 7 (stating "none of the prior art alone or in combination teaches the limitations of the independent claim specifically [] an upper mount and a lower mount configured to couple to each other, the lower mount configured to engage the transrectal probe…"). While a "patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim," *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722,

740 (2002), the patentee may rebut this presumption by demonstrating that "the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was some other reason suggesting that the patentee could reasonably have been expected to have described the alleged equivalent," *Paone v. Microsoft Corp.*, 881 F. Supp. 2d 386, 419 (E.D.N.Y. 2012) (citation omitted). Here, the added language does not narrow the claim but provides clarity that there needs to be a lower mount for the upper mount to couple to in order to engage with the probe. The added language also does not appear necessary to distinguish the '681 Patent from prior art or and does not evidence a disavowal of claim scope.

Even if there is "territory" between the original claim language and Corbin's amendment to Term 5, it would not support AMD's proposed construction here. Nothing in the specification or claim language suggest that the lower mount must "independently" engage the probe. *See generally* ECF 75-1 ('681 Patent); *see, e.g.*, *Renishaw PLC v. Marpoos Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) ("[I]f an apparatus claim recites a general structure (*e.g.,* a noun) without limiting that structure to a specific subset of structures (*e.g.*, with an adjective), we will generally construe the claim to cover all known types of that structure that are supported by the patent disclosure."). The plain and ordinary meaning of Term 5 is consistent with the intrinsic evidence. The term can be understood when read in the context of the claim language; therefore, the Court will adopt the plain and ordinary meaning of Term 5 ("an upper mount and a lower mount configured to couple to each other, the lower mount configured to engage the transrectal probe"). *See* ECF 75-1 ('681 Patent) at col. 15:11-33.

    **c. Term 6: "platform configured to slide (on the [a] pair of stabilization bars [members], relative to the base, relative to the pair of stabilization members, within the channel)"**

| Term 6 | Patent(s) & Claim(s) Involved | Advance Medical's Proposed Construction | Corbin's Proposed Construction |
|---|---|---|---|
| "platform configured to slide (on the [a] pair of stabilization bars [members], relative to the base, relative to the pair of stabilization members, within the channel)" | '681 Patent (claim 1)<br><br>'762 Patent (claims 13, 36)<br><br>'677 Patent (claims 1, 13, 22) | "the platform configured to slide (on the pair of stabilization bars [members], relative to the base, relative to the pair of stabilization members, within the channel) while the access needle is engaged with the platform." | No construction necessary - plain and ordinary meaning |

For Term 6, AMD proposes the addition of a clause to clarify that the platform which is set against the perineum to guide the biopsy needle must be configured to slide on the stabilization bars "*when the access needle is engaged with the platform*" whereas "the prior art slides the platform prior to insertion of the access needle." ECF 122 at 25 (emphasis added). In support of this proposed construction, AMD once again relies on the doctrine of prosecution history estoppel. *Id*. ("[T]he disavowals made during the prosecution of the '681 Patent and related patents are applicable to its continuations including the '762 and the '677 Patent."). It contends that Corbin has repeatedly limited this claim (to both U.S. and E.U. regulators) to differentiate Corbin's apparatus from the Onik Patent, which includes a platform that slides up against the perineum *before* the needle is inserted. *Id*. at 23-25. Therefore, AMD argues that its "proposed construction is consistent with the distinction that the patent applicant made in order to receive its patent." *Id*. at 25.

Corbin responds that "[n]one of the claims of the Asserted Patents have a requirement that the platform be configured to slide 'while the access needle is engaged with the platform.'" ECF 132 at 21. Corbin insists that AMD's proposed construction here attempts to import an "improper" limitation into the claims because there is no support for it in the intrinsic record. *Id*. at 21-22.

Corbin also contends that the portions of the prosecution history relied on by AMD are either inapposite or taken out of context. ECF 132 at 23-24. Corbin argues that it did not disavow claim language when addressing the Onik Patent in its prosecution of the '681 Patent in the USPTO and in the European Patent Office. *Id*. at 24-26. Rather, Corbin states that it provided "an 'overview' discussion of Onik" and "background information on Onik's teachings," but it did not rely on the timing of the biopsy needle's insertion to differentiate the '681 Patent from the Onik Patent. *Id*.

Corbin also argues that AMD's proposed construction violates the doctrine of claim differentiation. In patent law, an applicant may state a dependent claim by incorporating by reference a previous claim and then "specify[ing] a further limitation of the subject matter claimed." 35 U.S.C. § 112(d). In other words, a dependent claim must add a limitation to the independent claim it is based on. The doctrine of claim differentiation refers to the related presumption that an independent claim should *not* be construed as requiring a limitation added by a dependent claim. *See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005). The language at issue here stems from independent claim 13 from the '762 Patent. AMD points out that dependent claim 18 from this same patent—which incorporates claim 13— adds the limitation "wherein inserting the access needle into the perineal access site comprises sliding the access needle and platform along a portion of a length of the pair of stabilization members." ECF 122 at 25 (citing ECF 75-2 ('762 Patent) at col. 16:35-38). Corbin argues that the doctrine of claim differentiation supports its broader reading of independent claim 13—*i.e.*, claim 13 does not require that the needle and platform slide together another the stabilization bars—and against importing the limitation ("while the access needle is engaged with the platform") proposed by AMD. ECF 132 at 28-29.

The Court finds AMD's proposed construction and supporting arguments unpersuasive. The plain language of the claims at issue does not say anything about when the access needle must engage with the platform (*i.e.*, before or after it is positioned against the perineum) and thus does not support AMD's proposed construction. *See* ECF 75-1 ('681 Patent) at col. 15:11-33; ECF 75-2 ('762 Patent) at col. 16:5-15, 17:35-18:12; ECF 75-3 ('677 Patent) at col. 15:10-27, col. 15:59-16:9, 16:34-55. No other intrinsic evidence from the specification or embodiments specifies that the access needle must engage with the platform prior to sliding against the perineum. *See* ECF 75-1; ECF 75-2; ECF 75-3; *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[I]n redefining the meaning of particular claim terms away from the ordinary meaning, the intrinsic evidence must 'clearly set forth' or 'clearly redefine' a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." (citation omitted)). Here again, AMD fails to point to statements in the prosecution history that represent a clear or unmistakable disavowal by Corbin of the plain meaning of Term 6. AMD's citation to Corbin's application to the European Patent Office as an example of disavowal, ECF 58-16, ECF 58-18, is not sufficient to overcome the heavy presumption in favor of a plain language reading of claim terms. *See Bell Atl.*, 262 F.3d at 1268 ("Generally, there is a 'heavy presumption' in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art." (citation omitted)). Finally, under the doctrine of claim differentiation, the limitations found in dependent claim 18 of the '762 Patent should not be read into broader claim language of independent claim 13. *See Innovative Office Prods., Inc. v. SpaceCo, Inc.*, No. 05-04037, 2007 WL 2461747, at *6 (E.D. Pa. Aug. 23, 2007) (under the doctrine of claim differentiation, where "additional limitations regarding the set screw are found in dependent claims, the broader 'means for attachment' does not include these limitations").

AMD's proposed construction impermissibly adds a limitation not found in the intrinsic evidence. *See Renishaw*, 158 F.3d at 1249 ("If we need not rely on a limitation to interpret what the patentee meant by a particular term or phrase in a claim, that limitation is 'extraneous' and cannot constrain the claim."). Accordingly, the Court will adopt the plain and ordinary meaning of Term 6 ("platform configured to slide (on the [a] pair of stabilization bars [members], relative to the base, relative to the pair of stabilization members, within the channel)").

    d.  **Term 7: "so as to displace the access needle along the at least a portion of the length"**

| Term 7 | Patent(s) & Claim(s) Involved | AMD's Proposed Construction | Corbin's Proposed Construction |
|---|---|---|---|
| "so as to displace the access needle along the at least a portion of the length" | '681 Patent (claim 1) | "so as to move the access needle from a first position to a second position between the front portion and back portion of the stabilization bars" | No construction necessary - plain and ordinary meaning |

For Term 7, AMD proposes a construction that would require the platform used to support the access needle to be contained within—and slide between—the stabilization bars. To support this proposed construction, AMD relies on the same prosecution disclaimer arguments for its proposed construction of Term 6. *See* ECF 122 at 22-26.[5] That is, AMD relies on representations Corbin made in prosecution of the '681 Patent to contend that Corbin disclaimed its invention

---

[5] During prior rounds of claim construction briefing, AMD's proposed construction for Term 7 ("so as to displace the access needle along the at least a portion of the length"), ECF 122 at 22, ECF 58 at 16, was different than its currently proposed construction. While AMD did not provide updated briefing to address the change in its proposed construction of Term 7, its arguments at the hearing mirrored those in its earlier briefing.

covering a device with an access needle guide/platform that extended beyond the stabilization bars. *See* ECF 122 at 26.

As with Term 6, AMD's proposed construction impermissibly adds a limitation into the claims that is not supported by the claim language or specification. *See* ECF 75-1 ('681 Patent) at col. 15:11-33; ECF 132 at 28 (in the '681 Patent, "there is no requirement that the platform 'is configured to slide from a back to a front of the first and second stabilization bars'"). Because there is nothing within the intrinsic evidence that amounts to a clear and unmistakable intent to depart from the plain and ordinary meaning or to set forth a different definition, the Court will adopt the plain and ordinary meaning of Term 7 ("so as to displace the access needle along the at least a portion of the length"). *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed Cir. 2014) ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal.").

    **e.    Term 8: "the access being centrally positioned between the pair of stabilization members when the access needle is engaged with the platform"**

| Term 8 | Patent(s) & Claim(s) Involved | AMD's Proposed Construction | Corbin's Proposed Construction |
|---|---|---|---|
| "the access needle being centrally positioned between the pair of stabilization members when the access needle is engaged with the platform" | '762 Patent (claim 13) | "the access needle being centrally positioned in the space separating the pair of stabilization members when the access needle is engaged with the platform" | No construction necessary - plain and ordinary meaning |

For Term 8, AMD seeks a construction that would require that the access needle to be positioned in the space between the platform's two stabilization bars. *See* ECF 122 at 27. Thus, AMD's proposed construction would require the access needle to be centered both laterally and

vertically between the stabilization bars. In substituting "in the space separating" for "between," AMD relies in part on dictionary definitions. Courts have cautioned against overreliance on extrinsic dictionary definitions in interpreting claim terms. *See Phillips*, 415 F.3d at 1321 ("heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification"). However, AMD argues that this presumption against dictionary usage is inapposite here because it relies on the dictionary to clarify and confirm the plain and ordinary meaning of the term "between" in this context. ECF 122 at 27 (citing ECF 58-10).

For its part, Corbin argues that the plain language of the claim merely requires that the access guide be laterally centered but says nothing about the needle guide's vertical orientation vis-à-vis the stabilization bars. *See* ECF 132 at 30. Corbin also contends that AMD's proposal is at odds with the language in the '762 Patent. ECF 122 at 29-30 ("[n]owhere does the '762 Patent mention the term 'space separating' or even the word 'separating'"). Specifically, while the claim states that the access needle be "centrally positioned between the pair of stabilization members," ECF 75-2 ('762 Patent) at col. 16:12-15, the specification adds that "the location of the hole can be configured at any position of the guide" and is not confined to the "central midline position." *Id*. at col. 9:38-54; *see also* ECF 132 at 29 ("The word 'between' was never defined by the inventor, and he never provided any indication that one should deviate from the plain and ordinary meaning of that term.").

AMD's proposed construction is not supported by intrinsic evidence, and AMD's attempt to rely on a dictionary definition for "between" is unpersuasive and creates unnecessary confusion. AMD points to a Merriam-Webster Dictionary entry that defines "between" as "in the time, space,

or interval that separates. *See* ECF 132 at 27 (citing ECF 58-10). But the same entry also defines

"between" as "in intermediate relation to" and "from one to another of." *See* ECF 58-10. AMD

fails to explain why its narrow definition of "between" should take precedence over the plain and

ordinary meaning. *See* ECF 75-2 at Fig. 20 & col. 3:56-58 (exemplary embodiment showing access

needle extending beyond the space separating the stabilization members). The Court will not

deviate from the plain and ordinary meaning of Term 8 ("the access needle being centrally

positioned between the pair of stabilization members when the access needle is engaged with the

platform") because a POSITA would understand the meaning and scope of the term from the claim

and specification.

   **f.  Terms 11-13**

   **Term 11: coupling [securing] the access needle to the one of the plurality of needle
receiving ports of the displacement member of the transperineal biopsy guide such that a
position and angle of the access needle relative to the displacement member is retained
[maintained]"**

| Term 11 | Patent(s) & Claim(s) Involved | AMD's Proposed Construction | Corbin's Proposed Construction |
|---|---|---|---|
| "coupling [securing] the access needle to the one of the plurality of needle receiving ports of the displacement member of the transperineal biopsy guide such that a position and angle of the access needle relative to the displacement member is retained [maintained]" | '436 Patent (claims 1, 13, 24) | "after inserting the access needle into the one of a plurality of needle receiving ports but before inserting the access needle into the patient, engaging the access needle to a structural feature of the transperineal biopsy guide that prevents any longitudinal or angular movement of the access needle relative to the displacement member during insertion of the access needle into the patient" | No construction necessary - plain and ordinary meaning |

**Term 12: "wherein securing the access needle to the one of a plurality of needle receiving ports of the displacement member includes inserting a structure that is engaged with the tubular shaft of the access needle into the one of a plurality of needle receiving ports"**

| Term 12 | Patent(s) & Claim(s) Involved [USPTO Current Claim Status] | AMD's Proposed Construction | Corbin's Proposed Construction |
|---|---|---|---|
| "wherein securing the access needle to the one of a plurality of needle receiving ports of the displacement member includes inserting a structure that is engaged with the tubular shaft of the access needle into the one of a plurality of needle receiving ports" | '436 Patent (claim 25) | "engaging the access needle to the one of a plurality of needle receiving ports of the displacement member includes inserting a structure that that is engaged with the tubular shaft of the access needle into the one of a plurality of needle receiving ports such that any longitudinal movement of the access needle relative to the displacement member is prevented during insertion of the access needle into the patient" | No construction necessary - plain and ordinary meaning |

**Term 13: "wherein securing the access needle to the one of a plurality of needle receiving ports of the displacement member restricts rotation of the access needle"**

| Term 13 | Patent(s) & Claim(s) Involved | AMD's Proposed Construction | Corbin's Proposed Construction |
|---|---|---|---|
| "wherein securing the access needle to the one of a plurality of needle receiving ports of the displacement member restricts rotation of the access needle relative to the displacement member" | '436 Patent (claim 30) | "wherein a portion of the access needle engages with corresponding features of one of a plurality of needle receiving ports of the displacement member such that the access needle is restrained from rotating relative to the displacement member during insertion of the access needle into the patient" | No construction necessary - plain and ordinary meaning |

Because they involve similar claim language from the '436 Patent, Terms 11-13 can be analyzed together. In earlier rounds of claim construction briefing, AMD proposed different

constructions for Terms 11-13 than those it is proposing now. *Compare* ECF 74 at 7 *with* ECF 152 at 6-7. AMD argues that it revised its proposed constructions of the terms based on positions taken by Corbin in the USPTO post-grant review ("PGR") for the '436 Patent. Specifically, AMD contends that its proposed constructions take into account a temporal limitation to the "coupling/securing" of the access needle (that the access needle needs to be locked into the needle guide *while* the needle guide is inserted into the perineum) that Corbin added to Terms 11-13 during the PGR of the '436 Patent. ECF 122 at 34-35. AMD also argues that even though the Patent Trial and Appeal Board ("PTAB") denied AMD's request for rehearing on the decision denying PGR, the PTAB "confirmed that the access needle must be coupled/secured to the guide ***during*** insertion into the patient." ECF 122 at 36 (emphasis in original) (citing ECF 132-4 at 12).

AMD also asserts that Corbin made arguments in the '056 Patent reexamination proceedings that further support AMD's proposed construction of Terms 11-13. *See* ECF 149 at 16-17 ("The '056 Patent prosecution history makes clear that the coupling and securing claim limitations require more than merely supporting, positioning, or holding the access needle."). According to AMD, in the '056 Patent reexamination, Corbin distinguished the access needle of the '056 Patent from that of the Onik Patent by arguing that Onik "teaches a needle that moves in and out of the needle guide" while the '056 Patent requires the access needle to be secured to the displacement member before being inserted into the patient and to remain secured throughout insertion. *Id*. at 16-17. Thus, AMD argues that its "proposed construction is proper because it captures Corbin's caveats on 'securing' and 'coupling' to overcome the prior art." ECF 149 at 17.

Corbin, on the other hand, contends that AMD filed a petition for PGR of the '436 Patent and lost because the PTAB declined PGR. ECF 107 at 3. In its decision denying PGR, the PTAB noted that it "interpret[s] a claim 'using the *same claim construction standard that would be used*

*to construe the claim in a civil action* under 35 U.S.C. § 282(b)' [that is] in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." ECF 107-1 (PTAB Decision Denying PGR) at 12 (citing 37 C.F.R. § 42.200(b) (emphasis added)). The PTAB also stated that "that the terms 'coupling' and 'securing' are defined by the claims themselves" and "should be given their plain and ordinary meaning." *Id*. at 14-15. Corbin states that it has maintained a consistent position regarding Terms 11-13 before the PTAB and in this litigation, *see* ECF 107 at 3, while AMD is attempting to impose an improper temporal limitation on these terms. ECF 132 at 38 ("AMD's new proposed construction adds new words and phrases that never appear in Corbin's PGR arguments or the PTAB decision."). Corbin argues that AMD is rewriting its proposed claim construction for Terms 11-13 for the second time and importing limitations into the claims to escape infringement of the '436 Patent. *Id*. at 38, 35, 39.

AMD's proposed constructions for Terms 11-13 delete key language from the claims (namely "coupling" and "securing"). All of the claims of the '436 Patent involving Terms 11-13 require either "securing" or "coupling" the access needle to one of the "plurality of needle receiving ports of the displacement member." ECF 132 at 39; *see C.M.L. s.r.l v. Ineco Indus. Navarra de Equipos y Comercio, S.A.*, 177 F. Supp. 2d 442, 445 (D. Md. 2001) ("The court must look first to the actual wording of the claims" which "are to be given their common and ordinary meaning."). Independent claims 1, 13, and 24 (Term 11) require "coupling [securing] the access needle to the one of the plurality of needle receiving ports of the displacement member of the transperineal biopsy guide…." ECF 75-5 ('436 Patent) at col. 36:1-3; col. 36:59-61 ("securing the access needle to the displacement member such that a position and angle of the access needle relative to the displacement member is maintained"); col. 38:3-5 ("securing the access needle to

one of a plurality of needle receiving ports of the displacement member such that a position and angle of the access needle relative to the displacement member is maintained"); *see also id*. at col. 36:32-34 (Claim 10); col. 26:30-31('436 Patent specification) ("FIG. 35D. depicts the access needle…coupling with the displacement member"). Claim 25 (Term 12) and Claim 30 (Terms 13) both require "securing the access needle to one of a plurality of needle receiving ports of the displacement member …." *Id*. at col. 38:14-16; col. 38:41-44. There is no support in the claim language, specification, or prosecution history[6] for AMD's substitution of "engaging" and "engages" for "coupling" and "securing" in Terms 11-13.

AMD's proposed constructions also add language and rewrite the claims in a manner that is not supported by intrinsic evidence. For example, AMD adds the requirement that the access needle "engag[e]" to "a structural feature of the biopsy guide" in Term 11. ECF 152 at 6. But AMD provides no explanation or support for its addition of the phrase "structural feature," and the phrase does not exist in the relevant claims or specification of the '436 Patent. In Term 13, AMD changes the existing claim language to require "a portion of the access needle" to "engage[]" with corresponding features of one of a plurality of needle receiving ports." *Id*. at 6-7. But the claim

---

[6] *See* ECF 107-1 (PTAB Decision Denying PGR) at 14-16 ("[W]e determine that the terms 'coupling' and 'securing' should be given their plain and ordinary meaning in the context of the claim language such that, for claim 1, the access needle is 'coupl[ed]' to 'the one of the plurality of needle receiving ports of the displacement member . . . such that a position and angle of the access needle relative to the displacement member is retained.' For claim 13, the access needle is 'secur[ed]' to 'the access needle in the displacement member such that a position and angle of the access needle relative to the displacement member is maintained.' Lastly, for claim 24, the access needle is 'secur[ed]' to 'the one of a plurality of needle receiving ports of the displacement member such that position and angle of the access needle relative to the displacement member is maintained.' For purposes of this Decision, we also clarify that 'coupling' and 'securing' do not simply mean 'inserting.'"); *see also* ECF 137-8 at 32-33 (comparing "securing" limitations in claim 13 of the '056 Patent and claims 13 and 24 of the '436 Patent and asserting that "the claims require [construing] 'securing' in accordance with its plain and ordinary meaning").

terms are not limited to securing "a portion" of the access needle; rather, they clearly require "securing the access needle." *See* ECF 75-5 ('436 Patent) at col. 38:3-5; col. 38:41-44. And the phrase "corresponding features" lacks specificity and creates confusion. *See Paice LLC v. Hyundai Motor Co.*, No. WDQ-12-0499, 2014 WL 3725652, at *7 (D. Md. July 24, 2014).

Finally, AMD's proposed constructions for Terms 11-13 improperly import temporal limitations that do not exist in the claim language and are unsupported by the intrinsic record. For example, each of AMD's proposed constructions for Terms 11-13 adds the phrase "during the insertion of the access needle into the patient." ECF 152 at 6-7. However, this language is not found in the claim language of the '436 Patent or its specification. *See generally* ECF 75-5 ('436 Patent). AMD offers prosecution history arguments to support this temporal limitation, which are unavailing. First, AMD asserts that the PTAB's decision denying AMD's request for a rehearing, ECF 132-4, "confirmed that the access needle must be coupled/secured to the guide ***during*** insertion into the patient," ECF 122 at 36 (emphasis in original). This conclusion is not clear from the face of the PTAB's decision. *See* ECF 132-4 at 12-13. And even if, as AMD argues, the PTAB's decision denying AMD's request for rehearing could be construed as implicitly requiring the access needle to be "coupled/secured during insertion," ECF 122 at 36, the PTAB decision is not prosecution history disclaimer because it is not a statement made by Corbin. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) ("It is well settled…that it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims."). Finally, the prosecution history does not evidence statements by Corbin amounting to a clear disavowal of the relevant claim language. *See, e.g.*, ECF 100-5; *see also Phillips*, 415 F.3d at 1317 ("because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that

negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes"); *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 152-53 (Fed. Cir. June 3, 2011) (finding that "the disputed prosecution history does not contain a 'clear and deliberate statement' that meets the high standard for a disclaimer of claim scope").

AMD's proposed constructions for Terms 11-13 improperly delete key language and import limitations that are not supported by the intrinsic evidence. The Court will not deviate from the plain and ordinary meaning for Terms 11-13.

## IV.  CONCLUSION

The Court construes the eight terms as discussed above. A separate Order follows.


Dated: May 7, 2025                                                  _____/s/_____
                                                                                    Stephanie A. Gallagher
                                                                                    United States District Judge